IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STATE FARM BANK, F.S.B.,
    et al.,

        Plaintiffs,

                                        Case No. C2-05-268
    vs.                                 Judge Edmund A. Sargus, Jr.
                                        Magistrate Judge Terence P. Kemp

JOHN B. REARDON,
    Superintendent of the Ohio Division
    of Financial Institutions,

        Defendant.[1]

## OPINION AND ORDER

This matter is now before the Court for consideration of the parties' Cross-Motions for

Summary Judgment. This case calls upon the Court to determine whether the Office of Thrift

Supervision ("OTS") has lawfully preempted, in part, Ohio law requiring independent mortgage

brokers to obtain licenses from the State before marketing first and second mortgages. The Court

concludes that, while the OTS may have the authority to extend federal preemption to agents of

federal depository institutions, it has failed to comply with the Administrative Procedure Act in

its efforts to do so. For the reasons that follow, Plaintiffs' Motion for Summary Judgment is

---

[1]        Pursuant to Federal Rule of Civil Procedure 25(d)(1), Defendant, John B. Reardon, is
hereby substituted for former Defendant, F. Scott O'Donnell, as the Superintendent of the Ohio Division
Financial Institutions. Superintendent Reardon is responsible for the enforcement of Ohio laws
regulating financial institutions, including the laws and regulations relating to mortgage loans challenged
in this case. Because the Superintendent has been sued in his official capacity only, the Court refers to
Defendant generally as the State of Ohio.

denied; Defendant's Motion for Summary Judgment is granted.

## SUMMARY

At the core, this case involves a potential conflict between federal law regulating federal savings associations and state law licensing and regulating mortgage brokers. There is no dispute that state law regarding mortgage brokers does not apply to employees of a federal savings association or their subsidiaries. What is in dispute is whether current federal law and regulation prohibit state licensing of independent mortgage brokers who solicit loans exclusively for federal savings associations.

As described in detail below, the Plaintiff seeks to solicit mortgages through 702 independent insurance agents who otherwise market insurance products for State Farm Mutual, an insurance company which owns State Farm Bank, a federal savings association. The Plaintiff, State Farm Bank, proposes to market mortgages through the same independent State Farm Mutual insurance agents. As proposed by the Plaintiff, these independent agents would refer mortgage applications only to State Farm Bank, would undergo special training regarding mortgages, and would be supervised by State Farm Bank.

Under federal law, the Director of the Office of Thrift Supervision has been given broad authority to issue regulations as to the operation of federal savings banks. As described below, federal law clearly expresses Congressional intent that federal savings banks operate under a uniform national system. The Director is, therefore, authorized by federal law to issue regulations that may preempt, or supercede, state laws to the contrary.

State Farm Bank presented its proposed business model, involving insurance agents as solicitors of mortgages, for review by the Office of Thrift Supervision. The agency's chief counsel

-2-

responded with a lengthy letter which essentially concluded that the laws of twelve states, as to the licensing of mortgage brokers under the terms proposed by State Farm Bank, were in conflict with federal regulations regarding federal savings associations.

State Farm Bank then sent a copy of the letter to the Superintendent of the Ohio Division of Financial Institutions, advising him that the chief counsel had determined that the state law regarding licensing of mortgage banks was unconstitutional, as applied to independent agents of State Farm Bank. State Farm Bank requested a determination from the Superintendent that the state licensing scheme would not apply to the independent agents with whom the bank intended to contract for purposes of soliciting mortgages. The Superintendent maintained that state law had not been displaced and the state statutes would be enforced, thereby setting the stage for this lawsuit.

Under the Constitution, Congress is authorized to legislate in specific areas, as in the regulation of interstate commerce, relevant to this case. The Constitution expressly states that the law of the United States "shall be the Supreme law of the land." U.S. Const. art. VI, cl. 2. In those areas in which Congress is not authorized to legislate, the states retain sovereignty to legislate and determine public policy.

As to this case, a dispute affecting comity between federal and state authority has been, in the Court's view, unnecessarily created. Before the letter from chief counsel of the Office of Thrift Supervision to State Farm Bank, the federal agency had never before expressly regulated, or excluded from state regulation, independent third-parties soliciting mortgage loans for a federal savings association. This rather dramatic change in the federal regulatory scheme came, not with a formal regulation issued after publication and public hearing, but through a letter signed by counsel, not the Director, who is the only person authorized under federal law to issue regulations.

-3-

The State of Ohio was never asked for comment, nor even given formal notice of the federal agency's new position. Instead, a private party was issued an opinion letter from the federal agency's counsel; the private party then notified the State of Ohio, for the first time, that the agency contended that Ohio law had been preempted by the agency's actions.

While federal law is undisputedly supreme, the scenario just described is assuredly not what the Framers of the Constitution had in mind. State law may have to yield to federal law or regulation; it need not yield in the first instance to a letter issued by agency counsel to a private party purporting to invalidate the operation of a state statute.

The Administrative Procedure Act, subsequently described in detail, dovetails with proper consideration of the federal-state relationship by federal agencies. This Act requires that, before substantive rules become law, a federal agency must give public or actual notice to interested parties and the public that a regulation has been proposed. Interested parties must then be given a chance for comment before the regulation becomes law. Failure to comply with the Administrative Procedure Act renders the agency's actions illegal and of no effect.

Here, the agency made no attempt to comply with those requirements. Neither the State of Ohio nor many other interested parties were given the chance to comment on the new position of the agency. This is particularly noteworthy given the fact that the State of Ohio, and many other states, are experiencing a mortgage foreclosure crisis. While external events such as foreclosure actions cannot be the basis for invalidation of a rule, these same circumstances underscore the requirement of the Administrative Procedure Act that actions of agencies on matters of public concern be aired and debated.

The Office of Thrift Supervision does not propose to issue federal licenses to mortgage

-4-

brokers. Instead, a new category of mortgage brokers, not licensed by either the federal or state government, is envisioned by the agency's new policy. Such a change is precisely what is required by the Administrative Procedure Act to be submitted for comment and review. Because this procedure was not done, this Court concludes that the agency's position in the opinion letter is of no legal force and that the Ohio statutes regarding the licensing of mortgage brokers have not been preempted.

To be clear, the Office of Thrift Supervision may have the lawful authority to preempt the Ohio statutes at issue in this case, as specifically proposed in the opinion letter. While the agency may have the actual authority to take such steps, it must do so in accordance with the Administrative Procedure Act. It is not too much a burden to expect such compliance before a federal agency preempts the laws of twelve states.

## I.

The parties have stipulated the following facts:

1.      Plaintiff State Farm Bank, F.S.B. ("State Farm Bank"), is a federal savings association chartered by the Office of Thrift Supervision under the Home Owners' Loan Act, 12 U.S.C. § 1461 *et seq*.

2.      Under the Home Owners' Loan Act, The Office of Thrift Supervision ("OTS"), an office within the United States Department of the Treasury, regulates, supervises and examines State Farm Bank.

3.      State Farm Bank is a wholly owned subsidiary of State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and is headquartered in Bloomington, Illinois.

-5-

4.     State Farm Bank offers financial products and services, including first and second mortgages and home equity lines of credit, to customers and potential customers nationwide. However, State Farm Bank does not maintain any branches, nor does it maintain any Bank offices that are open to the public.

5.     State Farm Bank markets its financial products and services to the public primarily through independent contractors, who also are licensed insurance agents of State Farm Mutual and who market insurance exclusively for or as otherwise authorized by State Farm Mutual. The majority of State Farm Bank's independent contractor agents are individuals who maintain sole proprietorships, but some of the independent contractor agents are incorporated businesses.

6.     State Farm Bank requires each independent contractor agent who acts on behalf of State Farm Bank to enter into an exclusive agency agreement with State Farm Bank under which the contractor is permitted to market bank products and services only for State Farm Bank and not for any other banking or lending institution. A true and correct copy of the form of the agreement is attached hereto as Exhibit A.

7.     The State Farm Bank independent contractor agents provide information to customers regarding the financial products and services offered by State Farm Bank and assist customers in completing and submitting applications for loans to State Farm Bank. The independent contractor agents do not, however, evaluate loan applications, apply underwriting criteria, make lending decisions, or receive loan payments; those activities are performed by employees in State Farm Bank's loan operations offices (in St. Louis, Missouri).

8.     State Farm Bank requires its independent contractor agents to complete prescribed in-house education and training programs, including training directed to compliance with applicable

-6-

federal statutes, federal regulations, and OTS requirements related to the financial services and products offered by State Farm Bank. Such training programs have been reviewed by the OTS during the course of its examinations of State Farm Bank and its independent contractor agents.

9.      12 U.S.C. § 1463(a)(1) requires the Director of the OTS to provide for the examination, safe and sound operation, and regulation of savings associations.

10.     Pursuant to 12 U.S.C. § 1464(d)(7)(D), if a savings association causes any authorized service to be performed for the savings association by a person who is not a service company or subsidiary owned at least in part by the savings association (e.g., an independent contractor of the savings association, such as an independent contractor agent of State Farm Bank), the performance of the service is subject to examination by the Director of OTS to the same extent as if the services were being performed by the savings association on its own premises.

11.     Plaintiff George Meinberg is an independent contractor agent of State Farm Bank and is engaged in the marketing of State Farm Bank's deposit products and services, but currently not mortgage loan products and services, in the State of Ohio.

12.     State Farm Bank intends to offer, through its independent contract agents, first and second mortgage and home equity loans in the State of Ohio.

13.     Ohio Revised Code § 1322.01 *et seq.* requires persons who are not employees of depository institutions or subsidiaries or certain affiliates of depository institutions and who assist others in getting loans secured by mortgages on the borrowers' residences to obtain and maintain state mortgage broker licenses.

14.     On October 25, 2004, the OTS issued a formal opinion to State Farm Bank stating that: (1) State Farm Bank's exclusive independent contractor agents are subject to regulation,

examination, and oversight by the OTS, and (2) federal law preempts state-level laws (including the laws and regulations of the State of Ohio) that might otherwise apply to the banking-related activities of State Farm Bank's exclusive independent contractor agents ("the OTS Opinion").

15.     State Farm Bank notified the Superintendent of the Ohio Division of Financial Institutions (the "Superintendent") of the OTS Opinion that state mortgage broker licensing and related requirements are preempted with respect to the independent contract agents of State Farm Bank. In the notice, State Farm Bank provided the Superintendent with a copy of the OTS Opinion.

16.     The Superintendent does not propose to examine or otherwise regulate State Farm Bank.

17.     On its face, Ohio Revised Code § 1322.01 *et seq.* are applicable to and enforceable by the Superintendent against the independent contractor agents of State Farm Bank.

## II.

The procedure for considering whether summary judgment is appropriate is set forth in Federal Rule of Civil Procedure 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Here, the parties have filed cross-motions for summary judgment based on a set of stipulated facts. Thus, each party maintains that, based on the law of preemption, judgment as a matter of law is appropriate.

## III.

## A.     State Farm Bank and State Mortgage Broker Registration Laws

As set forth above, State Farm Bank is a federal savings bank chartered by the Office of Thrift Supervision ("OTS") under the Home Owners' Loan Act, 12 U.S.C. § 1461 *et seq.* State Farm Bank provides a variety of loan products and services, including first and second mortgages, car loans, and certificates of deposit. State Farm Bank does not maintain any branches or any bank offices that are open to the public, but instead markets its loan products and services through exclusive agents, which are independent contractors, not owned in whole or in part by the bank. As of December 31, 2006, there were 702 agents in Ohio who had successfully completed the requisite education and training to become agents of State Farm Bank. These agents have exclusive, contractual-representation arrangements with State Farm Bank, and intend to provide marketing, solicitation, and customer service for loan products exclusively for State Farm Bank and no other entities. Although the agents intend to provide information to customers regarding State Farm Bank's financial products and services and perform related functions to assist customers in completing and submitting applications, they will not evaluate the loan applications, apply underwriting criteria, make lending decisions, or accept loan payments.

Ohio Revised Code Chapter 1322 regulates the activities of certain entities or individuals who assist consumers in obtaining mortgage loans. Chapter 1322 requires a person who assists others in obtaining mortgage loans to do one of the following:

1. Limit their activities in assisting consumers to obtain mortgage loans;

2. Forego compensation for their covered activities in assisting consumers to obtain mortgage loans;

3. Qualify for and maintain a mortgage broker license; or

4. Qualify for and maintain a loan officers' license and work as an employee of a licensed mortgage broker.

-9-

Ohio Revised Code §§ 1322.01(E), (G); 1322.02. The Ohio General Assembly enacted Chapter 1322 to protect Ohio mortgage loan consumers from potential abuses that could pose a threat to consumers' homes and financial security.

Ohio Revised Code Chapter 1322, by its express terms, does not apply to a federal savings association, its employees, subsidiaries, or qualified affiliates.[2] As such, Chapter 1322 does not apply to State Farm Bank, or its employees, nor to State Farm Bank's subsidiaries or their employees nor to qualified affiliates or their employees. Ohio Rev. Code §§ 1322.02(C)(1)(a) and (C)(2). The State of Ohio, however, contends that this statute applies to State Farm Bank's independent-contractor agents, who wish to perform mortgage brokerage services. The State of Ohio emphasizes that the independent agents have a mere contractual relationship with the savings association, and must register, obtain licences and otherwise comply with the State's mortgage brokerage licensing statute, including compliance with a three-year prior mortgage experience requirement, before they may market first and second mortgages.

**B. OTS's Chief Counsel's Opinion Letter**

On October 25, 2004, OTS chief counsel's office issued an advisory opinion letter

---

[2]     Ohio Revised Code § 1322.02(C)(1)(a) expressly exempts banks and savings associations from application of the statute. As relevant here, the statute excludes in part:

> A bank, savings bank, savings and loan association, . . . or a subsidiary or affiliate of a bank, savings bank, savings and loan association . . . . As used in this division, "affiliate" means an entity that controls, is controlled by, or is under common control with, a bank, savings bank, [or] savings and loan association . . . and that board of governors of the federal reserve system, the comptroller of the currency, [or] the office of thrift supervision . . . has the authority to examine, supervise, and regulate including with respect to the affiliate's compliance with applicable consumer protection requirements.

Ohio Revised Code § 1332.02(C)(2) also exempts "[a]ny individual who is employed by a person exempt . . . ."

-10-

responding to an inquiry from State Farm Bank.  State Farm Bank sought an opinion as to whether

its independent agents who perform marketing, solicitation and customer service for its loan

products were "subject to state licensing or registration laws by reason of performing such

activities on behalf of, and as agents for" State Farm Bank.  (Opinion Letter, at 1.)³  In response

to the inquiry, the chief counsel for OTS first noted that OTS possessed "plenary authority" over

the operations of federal savings associations and their operations pursuant to the Home Owner's

Loan Act.  According to chief counsel, "[t]he comprehensiveness of the [Home Owner's Loan

Act] language demonstrates that Congress intended the federal scheme to be exclusive, leaving no

room for state regulation, conflicting or complementary."  *Id.* at 6.  Further, OTS relied on its

own regulation regarding federal preemption in the area of federal savings association's

operations:

> The regulations in this Part 545 are promulgated pursuant to the plenary and
> exclusive authority of the Office to regulate all aspects of the operations of Federal
> savings associations, as set forth in section 5(a) of the [Home Owner's Loan] Act.
> This exercise of the Office's authority is preemptive of any state law purporting
> to address the subject of the operations of a Federal savings association.

12 C.F.R. § 545.2.⁴  The letter from chief counsel emphasized that "federal savings associations

may exercise their authorized deposit and lending powers without regard to state laws that purport

to regulate or otherwise affect those powers, including state licensing and registration

requirements."  *Id.* at 6-7 (footnote omitted).  The chief counsel to OTS further noted that,

---

³ Opinion, Chief Counsel, Office of Thrift Supervision, "Authority of a Federal Savings Association to Perform Banking Activities through Agents Without Regard to State Licensing Requirements," Oct. 25, 2007, 2004 WL 3272094 (O.T.S.) (hereinafter, "Opinion Letter").

⁴ This regulation originally was promulgated in 1983 by the Federal Home Loan Bank Board ("FHLBB"), OTS's predecessor agency, and remains in effect.

-11-

consistent with the exclusive authority given to OTS to supervise, regulate and examine the operations of federal savings associations, it also was "authorized by statute to regulate and examine entities with which a federal savings association contracts." (*Id.* at 7.) The chief counsel cited The Examination Parity Act,[5] codified as § 5(d)(7) of the Home Owner's Loan Act, as support for this authority, which provides that if a savings association

> causes to be performed for itself, by contract or otherwise, any service authorized under [the Home Owner's Loan Act] . . . whether on or off its premises–
>
> > (i) such performance shall be subject to regulation and examination by the [OTS] Director to the same extent as if such services were being performed by the savings association on its own premises. . . ."

12 U.S.C. § 1464(d)(7)(D). Further, the chief counsel emphasized that § 5(d)(7)(E) of the Home Owner's Loan Act specifically authorized the director to issue regulations and orders, including enforcement orders, against any entity that contracts with federal savings associations. The chief counsel found as an additional source of its authority the statutory power to enforce § 8 of the Federal Deposit Insurance Act ("FDIA"), which permits OTS to take enforcement action against savings associations and "institution-affiliated parties" that OTS believes may be engaging in unsound thrift practices.[6]

Notably, the chief counsel recognized that federal savings associations may conduct their

---

[5] The full name of the legislation is The Examination Parity and Year 2000 Readiness for Financial Institutions Act, 12 U.S.C. § 1464(d)(7). The legislation added § 5(d)(7) to the Home Owner's Loan Act.

[6] As defined in the FDIA, the term "institution-affiliated party" includes an agent for an insured depository institution, and an independent contractor, such as an attorney, appraiser or accountant, who "knowingly or recklessly participates in . . . any violation of any law or regulation; . . . [or] any unsafe or unsound practice" that is likely to cause significant loss or adverse effect to a thrift. 12 U.S.C. § 1813(u)(1) & (4).

-12-

operations through subsidiaries. (Opinion Letter at 8-9, citing 12 C.F.R. Part 559). An "operating subsidiary" is defined as "any entity . . . that is designated by the parent savings association as an operating subsidiary . . . . More than 50% of the voting shares of an operating subsidiary must be owned, directly or indirectly, by a federal savings association and no other person or entity may exercise effective operating control. . . . ." 12 C.F.R. § 559.2. As noted in the letter, OTS regulations "apply to operating subsidiaries of federal savings associations only to the extent state laws apply to the parent federal savings associations." ( *Id.* at 9, citing 12 C.F.R. § 559.3(n).[7]) The letter also noted that subsidiaries are not subject to state law to the extent of their operating-parent savings association, and that its position

> reflects OTS's long-held view that because an operating subsidiary may only engage in activities permissible for its parent federal savings association and must be controlled and majority owned by the association, an operating subsidiary is the equivalent of a department or division of the parent federal savings association for regulatory and reporting purposes. Thus, because state licensing and registration requirements do not apply to federal savings associations when they are conducting lending and deposit activities, OTS has concluded that such state licensing and registration requirements also do not apply to the operating subsidiary. This is in large part due to the control the association has over the operating subsidiary and the OTS-imposed operational restrictions that are on the operating subsidiary.

*Id.* (citations omitted).

The chief counsel then reasoned that this exemption from state regulation is applicable even where an association contracts with a third party to conduct certain of its activities, because the association exercises sufficient control over that third-party agent:

> Federal savings associations have the ability to decide how they market and solicit

---

[7]  12 C.F.R. § 559.3 describes the characteristics of, and the requirements that apply "subordinate organizations" of federal savings associations. It refers to "operating subsidiaries" and "service corporations." It does not refer to, define or otherwise mention third-party independent contractors or agents.

-13-

> their banking products and services, subject to OTS's regulatory oversight. This
> principle is not abrogated, nor should state license and registration requirements
> become applicable, merely because an association contracts with a third party to
> perform marketing, solicitation, and customer service activities. This is particularly
> true where, as here, the Agents are exclusive, are required to undergo training, and
> are subject to the Association's supervision and control. The Association is
> therefore free to use its Affiliate's network of agents as an effective and efficient
> means of marketing the Association's products and services.

*Id.* at 10 (citation omitted). The chief counsel ultimately concluded that state licensing and

registration requirements interfere and conflict with the authority of State Farm Bank to exercise

its deposits and lending powers by limiting its ability to market its products and services through

its independent- contractor agents. OTS found that, "[o]bviously, the Association would not be

subject to these burdens if it performed the marketing, solicitation, and customer service activities

itself. In our view, the Association should not be subject to these burdens merely because the

Association chooses to use the Agents . . . ." *Id.* at 13. OTS declared that,

> [w]here an association exercises sufficient control over an agent's performance of
> authorized banking activities, the agent, like an operating subsidiary of a federal
> savings association, will be subject to OTS regulation and supervision, and federal
> preemption of state license and registration requirements applies to the agent, just
> as it would apply to an operating subsidiary.

*Id.* In summary, synthesizing 12 C.F.R. §§ 545.2, 560.2(b)(1), (10), 559.2 and 559.3(n)(1),

chief counsel concluded that a third-party independent contractor is "like," or equivalent of, an

operating subsidiary, and all state consumer-protection laws for licensing mortgage brokers do not

apply, by operation of preemption, to agents such as those who hold agreements with State Farm

Bank.

## IV.

As set forth more fully below, State Farm Bank contends that federal law preempts

-14-

application of the Ohio Mortgage Broker Act to its exclusive agents. [8] As support for that argument, State Farm Bank contends that OTS's Opinion Letter concerning preemption of state mortgage broker licensing laws as applied to the agents is controlling and entitled to deference. State Farm Bank also notes that, irrespective of OTS's Chief Counsel's Opinion Letter, the Court nonetheless can decide the case based on principles of preemption by applying the federal regulations to the facts presented by State Farm Bank's business model for its banking operations. Before addressing the effect of or requisite level of deference the Court should afford the administrative agency's position, the Court turns first to assess whether, independent of the Opinion Letter, there are grounds for finding preemption.

## A.    Preemption

State Farm Bank asserts that federal law preempts Ohio statutory requirements insofar as the state law attempts to licence agents performing work for, and under the exclusive supervision of a federal savings association. The doctrine of preemption "has its roots in the Supremacy Clause." *Fidelity Federal Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152 (1982). The Supremacy Clause provides that "the Laws of the United States which shall be made in Pursuance" of the Constitution "shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2; *see Gibbons v. Ogden*, 22 U.S. 1 (9 Wheat.) (1824). Federal regulations, as well as federal statutes, may preempt state law. *See, e.g., Hillsborough County, Fla. v. Automated Med. Labs, Inc.*, 471 U.S. 707, 713 (1985); *de la Cuesta*, 458 U.S. at 153.

---

[8]       The parties provided extensive and well-briefed motions for summary judgment on the issue of whether federal law preempts the licensing, registration and reporting requirements of Ohio Revised Code Chapter 1322. Following oral argument, the Court permitted the parties additional briefing on the issue of whether OTS complied with the Administrative Procedure Act, 5 U.S.C. § 553, with respect to the matters addressed in its Opinion Letter.

-15-

Preemption may be either express or implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). "Absent explicit preemptive language, Congress' intent to supersede state law may be inferred because '[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' because 'the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or because "the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose." *de la Cuesta*, 48 U.S. at 153 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Even where Congress has not completely displaced state regulation in a particular area, "state law is nullified to the extent that it actually conflicts with federal law." *Id.* State Farm Bank contends that the Ohio statute at issue this case is preempted from application to its agents under all three theories.

Preliminarily, the Court notes that "[t]he purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)(internal quotation marks omitted). "In all pre-emption cases . . . [the Court] 'start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). As it relates to national banks, generally, nondiscriminatory laws of general application that do not "forbid" or "impair significantly" national bank activities should not be preempted. *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 23, 33 (1996). National banks are subject to state laws

-16-

"unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions." *Anderson Nat. Bank v. Luckett*, 321 U.S. 233, 248 (1944).

## 1. *Express Preemption*

State Farm Bank first maintains that federal regulations expressly preempt Ohio law. OTS regulations specify that "federal savings associations may extend credit as authorized under federal law . . . without regard to state laws purporting to regulate or otherwise affect their credit activities." 12 C.F.R. § 560.2(a). As an illustrative example, Section 560.2(b) indicates that "the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding . . . [l]icensing, registration, filings, or reports by creditors" or "[p]rocessing, originating, servicing, sale or purchase of, or investment or participation in, mortgages" 12 C.F.R. § 560.2(b)(1) & (10). State Farm Bank contends that the licensing, registration, and reporting requirements challenged in this action "purport[] to regulate or otherwise affect" the federally authorized lending-related activities of federal thrifts, contrary to the dictates of 12 C.F.R. § 560.2(a), and thus are preempted by the OTS regulation.

Section 560.2 does not, however, expressly preempt any state law governing mortgage brokers not employed by a federal savings association or its subsidiaries. The parties do not dispute, and the matter is beyond contention, that OTS, through its regulations, has expressly preempted state law affecting mortgage lending for federally chartered institutions, including federal savings associations, such as State Farm Bank. The fundamental dilemma in this case, however, requires a more narrow focus upon the distinction between state attempts to regulate federal savings associations and their employees, on the one hand, and independent third parties

-17-

whose relationship with the savings associations is merely contractual. By its terms, Ohio Revised Code § 1322.01 *et seq*. does not apply, or attempt to, regulate State Farm Bank or its employees, subsidiaries or service companies. The requirements of the Ohio mortgage broker law extend only to third-parties who, in this case, seek to contract with the federal thrifts. Section 560.2, therefore, does not address, and hence does not expressly preempt, a consumer law targeted at third-party independent contractors who perform services, but are not owned by a federal savings association.

### 2.   *Field Preemption*

State Farm Bank also claims that OTS has occupied the entire field of regulation of federal thrifts. Field preemption of state law occurs when federal regulation is so pervasive as to leave no room for states to supplement or complement the federal structure. *de la Cuesta*, 458 U.S. 153. OTS expressly exercised its "plenary authority [pursuant to 12 U.S.C. §§ 1463(a) and 1464(a)] to issue regulations governing federal savings and loans," which includes the "promulgation of regulations superseding state law." *Id*. at 162. According to State Farm Bank, because OTS has occupied the entire field of regulation of the lending operations of federally chartered savings banks, state licensing, registration, and reporting requirements, such as those challenged here, are preempted by the OTS regulations.

The parties do not dispute that the Home Owner's Loan Act's grant of authority   to the OTS is extremely broad. Indeed, OTS is authorized to enforce consistent, nationwide regulations affecting lending and other authorized practices performed by federal savings associations by preempting state laws purporting to impose requirements on such authorized activities. 12 C.F.R. § 560.2(b)). There is no question that OTS possesses plenary authority to regulate federal savings

-18-

CriticalLawDoc

associations and to promulgate rules regulating these thrifts. Moreover, OTS has clearly declared

that it fully occupies the field as it relates to federal savings associations. Yet, before the letter

from the agency's chief counsel, the record contains no evidence that OTS has ever made the

claim that it occupies the field, or has exclusive authority over all aspects of the activities

performed by third-party agents with whom the savings association contracts.   ⁹   While OTS

occupies the field of regulation completely as the law relates to federal savings associations

themselves, the agency has not previously attempted or declared its authority to regulate entities

that are not federal thrifts or their subsidiaries, or to cloak wholly independent contractors with

a veil of immunity from state regulation.

## 3.   *Conflict Preemption*

State Farm Bank also contends that Ohio's licensing, registration and reporting

requirements may not be applied to its agents because the statute conflicts with federal law.

Conflict preemption "arises when 'compliance with both federal and state regulations is a physical

---

⁹        Under the Examination Parity Act (the "Parity Act"), codified as Section 5(d)(7) of
Home Owner's Loan Act, OTS has the authority to regulate and examine the performance of third-party
contractors, such as State Farm Bank's agents. Specifically, the Parity Act provides:

> [I]f a savings association, a subsidiary thereof, or any savings and loan affiliate or entity .
> . . that is regularly examined or subject to examination by the Director, causes to be
> performed for itself, by contract or otherwise, any service authorized under this chapter . .
> . whether on or off its premises– (i) such performance shall be subject to regulation and
> examination by the Director to the same extent as if such services were being performed by
> the savings association on its own premises. . . .

12 U.S.C. § 1464(d)(7)(D). The amendment grants OTS authority to examine the "performance" of
"services" by third-party service providers as if the "service" were being performed by the savings
association. OTS is not granted plenary authority to examine all aspects of a third-party contractor's
work. Furthermore, Defendant does not dispute that the Parity Act provides a basis for OTS to regulate
and examine certain services provided by State Farm Bank's agents, but contends that the amendment did
not permit OTS to regulate the agents exclusively, to the exclusion of all state laws, but they are instead
also subject to Ohio's Mortgage Broker laws.

-19-

impossibility'. . . or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *de la Cuesta*, 458 U.S. at 153 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963) and *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

State Farm Bank contends that the Ohio Mortgage Broker Act fundamentally restricts its right to exercise its lending powers "in accordance with a uniform federal scheme of regulation." 12 C.F.R. § 560.2. State Farm Bank objects that the Ohio law restricts and regulates the credit activities undertaken by its agents, and particularly, the Act's three-year prior experience requirement, Ohio Rev. Code § 1322.03, directly interferes with State Farm Bank's right to use its exclusive agents to market the mortgage loan products it is authorized to sell.

The Ohio Mortgage Broker law does not conflict with federal regulations because the state law does not limit a federal savings association's power to lend or extend credit; nor does it prohibit a federal thrift, or any of its employees or subsidiaries, from performing any of their functions. The law at issue does not, in any way, limit State Farm Bank itself from engaging in mortgage brokering services. The state law seeks to register and license those whose relationship with a federal savings association is born of and limited by contract, and has no legal effect on State Farm Bank's rights under the Home Owner's Loan Act to operate as a federal thrift, as the regulations are now constituted.

## 4. *Principles of Preemption Generally*

As it relates to preemption, generally, State Farm Bank relies heavily on the Supreme Court's recent ruling in *Watters v. Wachovia Bank*, 127 S. Ct. 1559, 1565-66 (2007). State Farm Bank suggests that *Watters* provides this Court with a precedential avenue through which to find

federal preemption here without resorting to the agency Opinion Letter. In the Court's view, *Watters* is plainly distinguishable.

In *Watters*, the Supreme Court held that, under the National Bank Act, a national bank's mortgage business, whether conducted by the bank itself or through one of the bank's operating subsidies, is subject exclusively to the superintendence of the Office of the Comptroller. The Court held that the Office of the Comptroller had correctly concluded in its regulations that an operating subsidiary is protected from state regulation of business of banking, and that the mortgage licensing, reporting, and visitorial regimes of the several states in which the subsidiary operates were preempted. *Id.* at 1572.

The *Watters* decision, however, is inapposite to the instant matter because the case concerned federal preemption of state law with respect to operating subsidiaries. As noted in *Watters*, the Office of the Comptroller had issued regulations dating back to 1966 recognizing the incidental authority of national banks to do business through operating subsidiaries.[10] The Office of the Comptroller has plenary power to oversee, supervise and regulate national bank operating subsidiaries to the same extent as the parent national bank. 12 C.F.R. § 5.34(e)(e)("An operating subsidiary conducts activities authorized under this section pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank.") Thus, as the Court found, "Congress and [the Office of the Comptroller] have indicated no doubt

---

[10]    As defined by the Comptroller's office, an operating subsidiary is on "in which a national bank may invest includes a corporation, limited liability company, or similar entity if the parent bank owns more than 50 percent of the voting (or similar type of controlling) interest of the operating subsidiary; or the parent bank otherwise controls the operating subsidiary and no other party controls more than 50 percent of the voting (or similar type of controlling) interest of the operating subsidiary." 5 C.F.R. § 5.34(e)(2).

-21-

that such subsidiaries are 'subject to the same terms and conditions' as the national banks themselves." *Watters*, 127 S. Ct. at 1571. *Watters* stands for the proposition that states may not regulate operating subsidiaries of national banks where the Office of the Comptroller, as expressed in binding regulations, has full supervisory and regulatory authority over the operating subsidiaries to the same extent as the parent national bank. Further, in this case, the Office of Thift Supervision has issued expressed rules, discussed *supra*, which preempt state laws as to subsidiaries of thrifts in the same manner preemption applies to the thrifts themselves. The *Watters* holding did not address federal agency preemption of state laws impacting wholly independent third-party contractors in which a federal financial institution has no ownership interest or direct operational control.[11]

---

[11]     Indeed, the dissenters in *Watters* objected to the Court's endorsement of an agency's determination that "the laws of a sovereign State must yield to federal power," and chided the majority for the "significant impact of [its] decision on the federal-state balance. . . ." *Watters*, 127 S.Ct. 1573 (Stevens, J., dissenting). In the dissenters' view:

[T]he Court's eagerness to infuse congressional silence with preemptive force threatens the vitality of most state laws as applied to national banks– a result at odds with the long and unbroken history of dual state and federal authority over national banks, not to mention our federal system of government. It is especially troubling that the Court so blithely preempts Michigan laws designed to protect consumers. Consumer protection is quintessentially a field which the States have traditionally occupied, the Court should therefore have been all the more reluctant to conclude that the "clear and manifest purpose of Congress" was to set aside the laws of a sovereign State.

*Id.* at 1581 (internal quotation marks omitted). The dissenters also consider the perils of vesting preemptive authority in administrative agencies:

The Comptroller may well have the authority to decide whether the activities of a mortgage broker, a real estate broker, or a travel agent should be characterized as "incidental" to banking, and to approve a bank's entry into those businesses, either directly or through its subsidiaries. . . . But that lesser power does not imply the far greater power to immunize banks or their subsidiaries from state laws regulating the conduct of their competitors.

*Id.* at 1583 (quotations omitted).

-22-

Finally, as it relates to argument in favor of preemption, State Farm Bank relies on the decision of the United States District Court for the District of Connecticut in *State Farm Bank, F.S.B. v. Burke*, 445 F. Supp. 2d 207 (2006). In *Burke*, the Court found that OTS regulations preempted Connecticut banking statutes– nearly identical to those at issue in the instant matter– as applied to the lending activities of State Farm Bank's exclusive agents. The Court also gave substantial judicial deference and controlling weight to the Opinion Letter solicited by State Farm Bank, finding that it was a rational reading of the agency's regulations. While this Court agrees with the court in *Burke* that the OTS has broad regulatory powers which could be used to preempt the State law in question here, it parts company in finding that the OTS has exercised such power through an opinion letter, rather than a new regulation. In *Burke*, the court declined to address the state's argument that the Opinion Letter had not been subjected to notice-and-comment procedures of the Administrative Procedure Act. As set forth more fully below, this Court concludes that the Opinion Letter effected a change in the law and the agency's existing policy, and cannot be afforded the weight of controlling law that the *Burke* court assigned to it.

## B.    The Opinion Letter and the Administrative Procedure Act

Having determined that OTS regulations, in and of themselves, do not provide a basis upon with to find federal preemption, the Court turns now to address the degree of deference due the Opinion Letter in which the administrative agency arrived at a contrary conclusion and determined that principles of preemption preclude application of state mortgage brokerage licensing laws to federal savings associations' independent contractors. State Farm Bank contends that the opinion letter is due the highest degree of deference as set forth in cases such as *Auer v. Robbins*, 519 U.S. 1452 (1997). Conversely, the State of Ohio contends that the letter is due no deference because

-23-

it is merely an opinion of OTS counsel and was not promulgated pursuant to formal notice-and-comment procedures of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*.

OTS is an independent federal regulatory agency vested with plenary authority to administer the Home Owner's Loan Act. Section 5(a) of Act, 12 U.S.C. § 1464(a), empowers OTS "under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as 'Federal Savings and Loan Associations.'" Pursuant to this authorization, the Director of OTS has promulgated regulations governing "'the powers and operations of every Federal savings and loan association from its cradle to its corporate grave.'" *de la Cuesta*, 458 U.S. at 145 (quoting *People v. Coast Federal Sav. & Loan Ass'n.*, 98 F.Supp. 311, 316 (S.D. Cal.1951)).

Under the Administrative Procedure Act, OTS may accomplish the purposes for which it was created by adjudication or by rulemaking. A rule, for purposes of the Administrative Procedure Act, is defined so broadly as to include virtually any statement an agency may make. 5 U.S.C. § 551(4).[12] The Administrative Procedure Act differentiates between two types of rules: (1) legislative rules, also referred to as "substantive" rules, and (2) interpretive rules or general statements of policy. *See Lincoln v. Vigil*, 508 U.S. 182, 196 (1993) (distinguishing (1) "so-called

---

[12]     Specifically, the Administrative Procedure Act defines the term "rule" as follows:

> [T]he whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4).

-24-

'legislative' or 'substantive' rules" and (2) " 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice' ") (quoting 5 U.S.C. § 553(b)).

The "'power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)(quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). When validly issued, regulations that interpret the underlying statute administered by the agency are accorded "*Chevron* deference." *Id.* at 842-43. An agency rule is legally binding only if it fills such a gap reasonably and in accordance with other procedural requirements. *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001).

In promulgating rules, federal administrative agencies are required by Section 3 of the Administrative Procedure Act to provide notice of the substance of the proposed rule, either by publication in the Federal Register or actual notice, and to accept and consider comments from interested parties. 5 U.S.C. § 553. These notice and comment procedures have two purposes: (1) to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies; and (2) to insure that the agency is presented with information and suggestions relevant to the problem at issue. *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993)(citations omitted).

As an exception to the notice-and-comment rule, an agency may issue statements or opinions interpreting the agency's own regulation, particularly if the regulation is ambiguous. *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)(citing *Auer*, 519 U.S. at 461)); 5 U.S.C. § 553, 556. The requirement of notice and comment does not apply to "to interpretative rules,

general statements of policy, or rules of agency organization, procedure, or practice . . . ." 5

U.S.C. § 553(b)(A). The Administrative Procedure Act, however, does not define the term

"interpretative," and the cases that have sought to distinguish between interpretative and

legislative rules have variously described the line dividing the two as unclear. *See, e.g., Friedrich*

*v. Secretary of Health & Human Servs.*, 894 F.3d 829, 834 (6th Cir. 1990)("We have discovered

no bright line that separates the two types of rules."); *General Motors Corp. v. Ruckelshaus*, 742

F.2d 1561, 1565 (D.C. Cir. 1984)(the distinction between the two types of rules is "enshrouded

in considerable smog" (citations omitted)). Nonetheless, certain general standards have emerged

that may assist a court in determining whether a particular rule is legislative or interpretative:

> First, the agency's own label, while relevant, is not dispositive. . . . An
> interpretative rule simply states what the administrative agency thinks the statute
> means, and only " 'reminds' affected parties of existing duties." . . . On the other
> hand, if by its action the agency intends to create new law, rights or duties, the rule
> is properly considered to be a legislative rule.

*General Motors*, 742 F.2d at 1565 (citations omitted)(as adopted by the Sixth Circuit in *Friedrich*,

894 F.3d at 834). For purposes of the Administrative Procedure Act, interpretative rules clarify,

interpret or explain existing law or state an administrative officer's understanding of a statutory

or regulatory term. As stated by the United States Court of Appeals for the Sixth Circuit:

> A legislative rule is one that "has the force of law," while an interpretive rule is
> "merely a clarification or explanation of an existing statute or rule" and is "
> 'issued by an agency to advise the public of the agency's construction of the
> statutes and rules which it administers.' " *Guardian Fed. Sav. & Loan v. Fed.
> Sav. & Loan Ins. Corp.*, 589 F.2d 658, 664-65 (D.C. Cir.1978) (quoting U.S.
> Department of Justice, Attorney General's Manual on the Administrative
> Procedure Act 30 n. 3 (1947)). Legislative rules "grant rights, impose obligations,
> or produce other significant effects on private interests," while interpretive rules
> do not "foreclose alternative courses of action or conclusively affect rights of
> private parties." *Batterton v. Marshall*, 648 F.2d 694, 701-02 (D.C. Cir.1980)
> (footnote omitted).

*State of Ohio Dep't of Human Servs. v. U.S. Dep't of Health & Human Servs.*, 862 F.2d 1228, 1233 (6th Cir. 1988)(holding that the adoption of an additional requirement not compelled or explicit in existing regulations required notice and comment); *see also Maximum Home Health Care, Inc. v. Shalala*, 272 F.3d 318, 322 (6th Cir. 2001)(same).

In the Opinion Letter, the chief counsel synthesized a number of federal banking regulations to arrive at the conclusion that any federal depository institution may engage any independent contractor, under the structure proposed by State Farm Bank, to make and service mortgages free from state oversight and consumer protection laws. Thus, the issue in this case is whether an opinion letter from the agency's chief counsel may have the force and effect of law so as to preempt the statutory schemes of several states. [13] Stated another way, the issue is whether the Opinion Letter may be construed as an interpretative rule, or whether it is a substantive rule that adds a new requirement which triggered the notice and comment procedure of the Administrative Procedure Act. The Court concludes that the OTS Opinion Letter effected a change in the law and the agency's existing policy, and cannot be construed as interpretative. Under these circumstances, the Court concludes that neither the Supremacy Clause nor the Administrative Procedure Act permits a federal agency, through an opinion letter not subject to notice and comment, to directly preempt state law.

Only "properly promulgated, substantive agency regulations have the 'force and effect of law'" necessary "to pre-empt state law under the Supremacy Clause." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96 (1979) (citations omitted). Moreover, "[i]nterpretations such as those in

---

[13] OTS's Opinion Letter indicates that at least 12 states require some type of mortgage broker licensing as a precondition to marketing first or second mortgages. (Opinion Letter, at p. 5 n.8.) At least three states have express three-year prior mortgage-experience requirements. (Id. at p. 5 n.9.)

-27-

opinion letters– like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law– do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)[14]; *see also Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 642 (6th Cir. 2004)(noting that, in light of *Christensen*, "cases will now arise involving agency action that we once might have considered "final" for APA-review purposes as a result of *Chevron's* legal effect but that we will no longer consider final because *Chevron* does not apply.)[15]

---

[14]     Virtually every relevant post- *Christensen* decision has declined to give *Chevron* deference to just this type of informal agency action. *See, e.g., Scales v. INS*, 232 F.3d 1159, 1165 (9th Cir. 2000) (concluding that a State Department Foreign Affairs Manual is not entitled to deference because the Attorney General, not the State Department, has statutory authority to interpret immigration statutes); *Madison v. Res. for Human Dev.*, 233 F.3d 175, 185-87 (3d Cir. 2000) (denying *Chevron* deference to interpretations of FLSA authorized by the Secretary of Labor as interpretive guidelines with no legal effect); *United States v. 162 Megamania Gambling Devices*, 231 F.3d 713, 719 (10th Cir. 2000) (concluding that opinion letters issued by the National Indian Gaming Commission are not entitled to *Chevron* deference); *Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 365 (4th Cir. 2000) (concluding that a statutory interpretation advanced by the Secretary of Labor as a litigating position in an amicus brief was entitled only to *Skidmore* deference); *Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 829 (10th Cir. 2000) (holding that agency policies still in draft form are not entitled to *Chevron* deference); *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 296-97 (5th Cir.2000) (finding that although public notice was given of a proposed rulemaking, the notice did not focus on the issue involved in a DOL interpretive bulletin, which lacked the force of law, and was therefore not entitled to *Chevron* deference).

[15]     On September 27, 2007, after briefing, State Farm Bank filed a Notice of Recent Authority, presenting a recent case, *Monroe Retail, Inc. v. Charter One Bank N.A.*, No. 3:06-2391, 2007 WL 2769645 (N.D. Ohio Sept. 18, 2007). State Farm Bank asserted that the court in *Monroe Retail* rejected the contention that the level of deference due to agency opinion letters was indicated by *Christensen*.

In *Monroe Retail*, plaintiffs, garnishor-creditors in the State of Ohio, routinely garnished judgment debtors' funds on deposits with the various defendant banks. The Ohio Code permits a $1.00 garnishment fee for all processing costs. The defendant banks sought to impose up to $80.00 more on the accounts prior to relinquishing the proceeds, thereby rreducing amount for recovery. The banks argued that they had a right to charge fees as "incidental to their power to carry on the business of banking," and that the statute was accordingly preempted.

The Court gave deference to the letter, and distinguished *Christensen*. In particular, the court said that the relevance of *Christensen* "was unclear." The court noted that "[i]n *Christensen*, the ... opinion was analyzed in the fashion of a non-legislative rule because the [agency] sought to directly

The regulations at issue here do not address or even mention the scope of OTS' authority over third-party independent contractors. "OTS is authorized to promulgate regulations that preempt state law affecting the operations of federal savings associations . . ." 12 C.F.R. § 560.2. The regulations "apply to operating subsidiaries," which, notably, are majority-owned and controlled by the parent savings association. 12 C.F.R. §§ 559.3(n), 559.2. In the Opinion Letter, however, the chief counsel found that a third-party independent contractor is "like," or equivalent to, an operating subsidiary. OTS has never before taken the position that its plenary authority over all aspects of the lending operations of federal savings associations extends to agents of the banks.

More fundamentally, the analogy made by the chief counsel between subsidiaries of federal savings associations and third-party mortgage brokers is expressly contradicted by existing regulations. A subsidiary, to be excluded from state regulation, must have the majority of its stock owned by the federal savings associations. In sharp contrast, State Farm Bank will not have any ownership interest in the independent insurance agencies which are to solicit mortgages under the proposal reviewed by the Office of Thrift Supervision. The distinction is an important one.

---

construe the statutory text. Here, on the other hand, this Court is faced with the OCC's interpretation of its own notice and comment regulation." The court then went on to use the *Auer* standard of deference, finding that the OCC had merely interpreted its own regulation.

As described in *Monroe Retail*, the OCC issued a regulation providing for the assessment against "customers of non-interest charges and fees . . ." The OCC had issued opinion letters interpreting this regulation. In these informal opinion letters, solicited by the defendants, the OCC found that banks "may exercise its discretionary authority to charge fees-- such as garnishment fees at issue here..." By contrast to the Opinion Letter at issue in this case, the agency opinion letters in Monroe Retail are merely interpretative of a single term in a regulation. The agency did not seek to synthesize several statutes and regulations to arrive at a new agency policy.

Federal savings associations exercise direct control over operating subsidiaries, service companies, and affiliates. The same is not true as to third-party agents.

State Farm Bank insists that OTS's Opinion Letter interpreting the regulations should be given deference under *Auer v. Robbins*, 519 U.S. 452 (1997). In *Auer*, the Supreme Court held that an agency's interpretation of its own regulation is entitled to deference. *Id.* at 461. *Auer* deference, however, is warranted only when the language of the regulation is ambiguous. The regulations in this case, however, are not ambiguous, and do not refer to the ability of OTS to invoke the power of the Supremacy Clause to preempt state law based upon the terms of a private contract. The Court notes that the law is unsettled as to whether the *Chevron*-deferential standard is ever appropriate to an agency decision determining the preemptive effect of a federal statute. *See, e.g, Watters*, 127 S.Ct. at 1584 (Stevens, J., dissenting)("Even if the OCC did intend its regulation to preempt the state laws at issue here, it would still not merit *Chevron* deference. No case from this Court has ever applied such a deferential standard to an agency decision that could so easily disrupt the federal-state balance."); *Medtronic*, 518 U.S., at 512 (O'Connor, J., concurring in part and dissenting in part) ("It is not certain that an agency regulation determining the pre-emptive effect of any federal statute is entitled to deference").

"To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen*, 529 U.S. at 588. Here, OTS announced a significant policy change and conclusively affected the rights and obligations of private parties. Thus, the Court concludes that OTS announced a substantive rule, which should have been subject to the rulemaking provisions, including notice and comment, of the Administrative Procedure Act.

OTS's failure to comply with the Administrative Procedure Act "precludes courts from affording [the letter] the force and effect of law." *Chrysler v. Brown*, 441 U.S. at 312. Accordingly, the Court concludes that OTS's failure to comply with the Administrative Procedure Act's notice and comment requirements invalidate the agency's position, as set forth in its Opinion Letter, that federal preemption of state license and registration requirements applies to State Farm Bank's contractor-agents.

Even if the Court had determined that OTS's Opinion Letter was merely interpretative, it still would not be entitled to deference because the legal conclusion that state mortgage broker laws do not apply to State Farm Bank's exclusive agents is inconsistent with he underlying OTS regulations. A federal agency is entitled to interpret its own regulation, but its interpretation is controlling only if it is consistent with the regulations it seeks to interpret" *Auer,* 519 U.S. at 461.

The applicable OTS regulation states, ". . . OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations . . . to enable federal savings associations to conduct their operations . . . ." 12 C.F.R §560.2(a) The regulation does not mention third-party contractors or exclusive agency agreements.

More troublesome, however, is OTS's conclusion that State Farm Bank's third-party independent contractors are "like" an operating subsidiary and "equivalent of a department or division of the parent federal savings association." OTS noted that federal savings associations are authorized to contract with third-parties to perform a variety of authorized services and have the ability to decide how they market and solicit their banking products. "This principle is not abrogated, nor should state license and registration requirements become applicable, merely because an association contracts with a third party to perform marketing, solicitation, and

-31-

—

customer service activities." (Opinion Letter, at p. 10.)

As noted previously, to qualify as an operating subsidiary of a federal savings association, the association must own, directly or indirectly, more than 50% of the voting shares of the entity; no other person or entity may exercise effective operating control of the entity; and the entity may only engage in activities that are permissible for a federal savings association. 12 C.F.R. § 559.2; *see also* 12 C.F.R. § 559.3 (2004). OTS existing regulations provide that state laws apply to operating subsidiaries of federal savings associations only to the extent state laws apply to the parent federal savings association because its parent federal savings association controls and hold a majority share of the operating subsidiary.[16]  Here, OTS's conclusion that an independent contractor, who is not owned or otherwise legally controlled by a savings association, is "like" and analogous to a subsidiary operation is inconsistent with the agency's existing regulation that defines the term. In particular, State Farm Bank's agreement with its exclusive agents provides that " [t]he relationship between the Bank and Agent is that of a company and independent contractor, for all purposes. . . . Agent has full control of his/her daily activities, with the right to exercise independent judgment as to time, place, and manner of marketing and selling the Bank Products to customers and prospective customers, and otherwise carrying out the provisions of this Agreement." (Corrected Stipulation of Facts, Exh. A, § 4.1 (Doc. #29-2).) By the very nature of their binding agreement, State Farm Bank is not liable for harm caused to another by an act or omission of its independent-contractor agents, and does not control their activities. The federal

---

[16]        OTS arrived at this conclusion and regulation through the notice and comment procedures of the Administrative Procedure Act. See "Federal Savings Associations: Operating Subsidiaries and Service Corporations," 57 Fed. Reg. 48942, 48945 (Oct. 29, 1992), and Preamble to Final Rule: "Subsidiaries and Equity Investments," 61 Fed. Reg. 66561, 66563 (Dec. 18, 1996).

thrift clearly does not, directly or indirectly, own "[m]ore than 50% of the voting shares" its agents' sole proprietorships or incorporated businesses. 12 C.F.R. § 559.2. Nor does State Farm Bank "exercise effective operating control" of its agents' operations. *Id.*

As the Supreme Court recently pronounced, "an isolated opinion of an agency official does not authorize a court to read a regulation inconsistently with its language." *Environmental Defense v. Duke Energy Corp*, 127 S. Ct. 1423, 1436 (2007). OTS has recognized the authority of federal thrifts to preempt state laws effecting operating subsidiaries. Congress, however, has never enacted legislation immunizing federal savings associations' independent third-party contractor agents from state laws regulating the business activities of mortgage brokers and lenders. Before OTS's chief counsel's Opinion Letter, even the executive agency had never sought to preempt such state laws as they relate these transactions when they are performed by agents of the federal thrift. OTS's attempt to do so now, even if the Court had concluded that the Opinion Letter was merely interpretative, fails as inconsistent with the agency's existing regulations.

## V.

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Doc. #31) is **DENIED**. Defendant's Motion for Summary Judgment (Doc. #30) is **GRANTED**. The Clerk is directed to remove this case from the Court's pending motions and cases list.

**IT IS SO ORDERED.**

9 - 28 - 2007
DATED

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE

-33-